UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

     v.                                     23-cr-36

ANTHONY NEUBAUER,

     Defendant.
_____

## ANTHONY NEUBAUER'S SENTENCING MEMORANDUM

Anthony Neubauer, by and through counsel (Eric M. Soehnlein, Esq.), respectfully submits the following sentencing memorandum in the above matter. The Plea Agreement in this case contemplates a sentencing range of 120-240 months of incarceration. The facts and circumstances demonstrate Mr. Neubauer is worthy of leniency. The defense respectfully requests a sentence of 120 months of incarceration.

## I.      Introduction

On September 9, 2024, Anthony Neubauer appeared before the Honorable Elizabeth A. Wolford, Chief United States District Judge, waived Indictment, and pled guilty to a one-count, Superseding Information, which charged Tony with Aiding and Abetting Kidnapping, between on or about May 27, 2014, and continuing until on or about May 28, 2014, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2.

The plea and plea agreement acknowledged that Tony violated the law. In taking the plea, Tony acknowledged his wrongdoing and went one step further to atone

for his conduct.  Tony understands there must be consequences for his actions.  He will do what he can to make things right, bring closure to J.A.'s family, and pay his debt to society.

Pursuant to Rule 11(c)(1)(c) of the Federal Rules of Criminal Procedure, the Plea Agreement contemplates a sentencing range between 120-240 months – a tacit acknowledgement by the parties that this is not a typical case.  In that regard, the uncontroverted facts of this case demonstrate that Tony is worthy of leniency:

- Tony had an unstable home life, experiencing traumatic loss and abandonment throughout his childhood;

- Tony is a highly decorated combat veteran who saw intense combat in Iraq in multiple deployments, serving as a United States Marine and an Army Ranger;

- Tony suffers from severe post-traumatic stress disorder and a traumatic brain injury, both sustained in his military service, and he did not receive meaningful treatment for either at any time relevant to this case;

- Tony was suffering from severe cocaine and alcohol addiction following his return home from the military, encompassing all times relevant to this case;

- Tony's addiction and weakened mental health were exploited by others for their personal gain, including the other individuals involved in J.A.'s disappearance.

Due to the unique facts and circumstances of this case, and in accord to the Plea Agreement, the defense respectfully requests a sentence of 120 months of incarceration.

## II.    Relevant Background

### a.  Early Life

Anthony Neubauer was born on June 5, 1986 to Clayton Neubauer and Jane
Vandeviver.  The couple never married.  Tony did not have any meaningful relationship
with his biological father.  Family reports that Tony's father suffered from alcoholism
and polysubstance abuse.  He was physically and emotionally abusive.  He hit Tony's
mother and threatened to strike Tony.  On more than one occasion Tony's mother had
to call law enforcement for protection.  By age 3, Tony's only contact with his biological
father were brief meet ups at the local McDonald's restaurant, supervised by law
enforcement.  A truck driver by profession, Tony's biological father made one attempt
to connect with his son while Tony was middle-school aged, taking him across country
on a long haul.  Tony describes the trip as "miserable."  His father showed little interest
in him.  They went days without really speaking.  Tony does not refer to his biological
father as his father.

For the first four years of Tony's life, his mother raised him on her own.  Around
the time Tony was four years old, Tony's mother entered a relationship with Kevin
Cobb, the man Tony considers to be his father.  Mr. Cobb was a stable and supportive
influence on Tony, serving as a much-needed father figure to Tony between ages 4-12.
They rode dirt bikes and snowmobiles together.  They went hunting and fishing.  Mr.
Cobb showed a genuine interest in Tony and made sure he engaged in activities with

other kids.  Family confirms, Mr. Cobb and Tony were nearly inseparable.  To this day, when Tony speaks of Mr. Cobb he chokes up and expresses his admiration for the man who treated him like a son.

Tony experienced the first in what would be several traumatic events when he was 12 years old.  Mr. Cobb suffered a medical episode in front of Tony in the family's kitchen, falling to the ground and losing consciousness. A 12-year-old boy with no medical training, Tony nevertheless attempted CPR on Mr. Cobb.  It was unsuccessful. When that didn't work Tony ran out of the house screaming for help, trying to flag down passing cars and running to the neighbor's house. Mr. Cobb could not be saved. Tony's only father figure died in front of him when he was just a boy.

The next several years were difficult for Tony.  He was directionless.  Family members report Tony often said he was "mad at God" for taking Kevin away from him. Tony was briefly referred to counseling in this time.  Counseling records indicate Tony was depressed and "hearing voices of people calling for help."  Despite these clear indicators that Tony was in a mental health crisis, for reasons undersigned does not understand, Tony was discharged from counseling in less than one month with no follow up.  Tony reports to counsel that he continued hearing voices for many years following Mr. Cobb's death.  Tony had lost a deeply meaningful person in his life, and he received no meaningful support.

As Tony's mental health spiraled, his mother's did too. Tony's mother took Mr. Cobb's loss very hard. She turned to alcohol and, by her own admission, she was not present for her children. She acknowledges that she "abandoned" Tony in this time, turning to "partying" to distract her from the crippling emotional pain of Mr. Cobb's death. She did not make sure Tony went to school, that he interacted appropriately with other children, or that he was in solid, supportive relationships. Mr. Neubauer's mother was so detached from his upbringing, it was only through the PSR process in this case that she learned he did not graduate from high school.

Directionless and receiving no meaningful parental support, Tony started to act out. Starting at age 13, he drank alcohol. He dabbled with drugs. He got into fights. He hung out with the wrong crowd. A large part of that was the beginning of his association with Matthew Rudy, who was dating Tony's cousin, Karen. Rudy was ten years older than Tony, in his early twenties at the time, but the two hung out on a regular basis. Rudy brought Tony to parties and to hunt (and hurt) animals in the woods. They drove around and drank beer. They used tobacco together when Tony was just 13 years old. They used firearms. They used illicit recreational drugs. Tony looked up to Rudy as an older brother figure. Tony did not have any other male role models in his life. Tony would look up to Matt for many years to come, often seeking his advice as a father-figure.

Unsurprisingly, Tony's high school career was punctuated by discipline issues. He did poorly in school. He failed several classes. He was forced to repeat the eleventh grade and did not graduate. His cumulative grade point average placed him near the bottom of the class of his class at Falconer High School.

Then, at 17 years old, Tony seemed to find his calling when he chose to enlist in the United States Marines.

**b. The United States Marines**

In speaking with people who know Tony, more than one person referred to him as "Captain America." The name fits. Around his 17th birthday, and with the attacks of September 11 in his memory, Tony stated he wanted to "do something that Kevin would be proud of." He fixated on military service, and on the Marine Corps in particular. Tony viewed the Marines as the most challenging and most prestigious military option available to him as a high-school aged kid. It was something he "didn't want to do halfway."

Tony seemed to have found his calling serving our nation's military, first in United States Marines and then as an Army Ranger. Serving several deployments, he saw combat. He was injured. He saw his fellow soldiers die. He fought and killed for our country. His service and sacrifice are remarkable.

Tony reported for duty in September, 2004, and he remained in the Marines until 2008. Deployed overseas for most of his time in the Marines, Tony saw live combat in the Iraq war. He witnessed his friends killed. As part of his service to our country, he killed members of the enemy. He went on covert missions. He spent significant time behind enemy lines. Tony's military service from that time period is nothing short of remarkable.

In speaking with other Marines who served with Tony, one antidote stands out. On patrol in Iraq, Tony and his fellow soldiers identified an armed enemy combatant in a tactical position. Tony, seated in a gunner position in the Humvee and having spotted the enemy first, fired upon the enemy, killing him. After the enemy fell, a soldier who appeared to be child-aged picked up the weapon and began to flee. Tony was ordered to fire upon the child, who possessed a military grade firearm and, in the judgment of Tony's commanding officers, had the ability to use the weapon against American soldiers. Tony refused to fire, conflicted that he had been asked to kill a child. The child fled. Tony was reprimanded and disciplined for not firing at the child. In speaking with Tony, the stress and inner conflict of the event remains to this day.

Another experience made lasting change to Tony. There was a time around 2006 when Tony had been out on an overnight mission and was then slated to be in the gunner position in a Humvee vehicle during the following day. Exhausted from being awake for over twenty-four hours, one of Tony's closest friends in the Marines, Nicholas

Palmer (who had not been on the overnight mission), told Tony to rest on the floor of the vehicle and that he would take Tony's position in the gunner seat. On that patrol, and while Tony was supposed to be seated in the turret, the Humvee was flagged down to stop by people who appeared to be Iraqi civilians. It was a set up. When stopped, the vehicle came under fire, and Palmer was killed. The survivor's guilt Tony experienced was intractable. It remains to this day, evoking tears in Tony's eyes when he discusses it. It's the reason why, years later, Tony named his only son Palmer in honor of the man who, in Tony's view, had died in his place.

Later in his Marine service, Tony sustained a serious injury from a roadside improvised explosive device (IED). The explosion, which went off when the vehicle he was traveling in drove over an unseen trip wire, killed fellow soldiers and knocked Tony unconscious, causing a blackout and debilitating aftereffects. In Tony's mind, the episode was what he had hoped to be a final brush with death. He made up his mind to get out of Iraq, hopefully for good, at his first opportunity.

Tony remained in the Marines until 2008, achieving the rank of Lance Corporal. He earned several awards and decorations for his service. What is more, he spent a prolonged period of that time in an active combat zone. He risked his life every day. He saw his friends die. He was at the risk of being killed nearly every day. In the most real way, he put his life on the line for our country.

### c. Life After the United States Marines

In 2008 Tony was honorably discharged from the United States Marines. He had also started a long-distance correspondence with his former middle school and high school girlfriend, Erica. He returned home to the Jamestown area. He was suffering from the aftereffects of the head injury and from the trauma of a prolonged combat-focused deployment. In her letter, Tony's mother remarks that, upon his return home, he was withdrawn, "darker," and engaged in substance abuse like never before. He started drinking heavily, which resulted in his first alcohol-related brush with the law. In hindsight, it is noteworthy that Tony had his first brush with the law, a DWI arrest with a blood alcohol level of .25% (over two and a half times the legal limit) on the night he returned home to Jamestown.

In speaking with counsel, Tony notes that, because of the intensity of his combat experience with the Marines, he was referred to counseling through the Marines and their standard discharge program. That is reflected in the PSR. He also notes that, at that time, he was told (and he believed): "real Marines don't need that bullshit." A misguided belief about masculinity and service impacted Tony's decision-making. To counsel, it is apparent that a stable, father-like influence in Tony's life at this period could have interceded and perhaps convinced Tony that real men did require counseling when they returned from a war-zone; Tony Neubauer did not have that influence, however.

9

Through the partying and drinking, Tony's relationship with Erica progressed. The couple started living together almost immediately after Tony returned to Jamestown. Soon thereafter, they learned they were pregnant with their first child, Elliana.

Tony wanted to do the right thing. He wanted to marry Erica and provide for his family. He did the only thing he knew how to do: he tried to re-enlist in the military. Despite repeated attempts, the United States Marines would not take him back. Citing his head injury and memory loss issues associated with the injury, the Marines deemed him unfit for duty.

Tony remained undeterred. He joined the United States Army, who did not see his combat injury as a prohibition to service. What is more, he did not simply enlist in the Army; rather, Tony enlisted in the elite Army Rangers program, an elite special operations force that specializes in conducting missions in combat zones and deep inside enemy territory.[1]

Tony married Erica on April 21, 2009. He reported to Army training soon thereafter. Over the course of the next five years, he was an Army Ranger, serving in a group that was tasked with training the newly minted Iraqi security forces. Once again, his military service meant a prolonged deployment to Iraq; once again, because of the

---

[1] See, https://www.goarmy.com/careers-and-jobs/specialty-careers/special-ops/army-rangers.

instability in the region at that period of time, Tony's military service meant he was deployed to an area where roadside bombs, sniper attacks and attacks against United States troops were common; once again, Tony risked his life in a combat zone for our country, witnessing friends and fellow soldiers shot and killed by his side.   The combat related trauma is unthinkable.

Tony's military career ultimately came to an end due to an incident that took place on American soil.  In 2014 Tony was stationed at Fort Drumm when he got into an altercation with other soldiers on base.  Perceiving that they had made a threat to Erica, Tony fought the other soldiers.  In the altercation he sustained several blows to the head, which compounded his prior injuries.  Tony's resultant head trauma led to a finding of complete disability by the Army.  The Army noted the repeated head injuries, memory loss and difficulty controlling aggression (attributed to the head injuries) as a reason to medically retire Tony.

Tony received an honorable discharge with full medical retirement.  Throughout his military service, Tony earned the achievement medal, the medal of valor, the combat action award, the good conduct medal, various humanitarian service awards, the global war on terror award, the U.S. Army action medal, as well as other awards.

### d. Life After the Military

In 2014 Tony Neubauer had been honorably discharged from the United States Marines and from the United States Army. He had a full medical retirement and did not need to work to earn an income. By that time, he was a father two, having had a second child, Lillian, two years after his first. A third child, Palmer, was on the way. Tony and Erica moved their family back to Jamestown to try to settle into family life. That is not what happened, however.

Given his head trauma and clear PTSD diagnosis, in hindsight, it is clear Tony needed to be linked with counseling and other supportive services. Upon his return to Jamestown he did go see a psychiatrist through the VA hospital to address his PTSD; feeling there was a negative stigma associated with those services, he discontinued treatment after a few months. In conversations with counsel about that specific period, Tony reaffirmed: "I felt like real soldiers don't need that stuff. Real soldiers hang out at the VFW and figure it out on their own."

What followed was equal parts predictable and tragic. Tony re-connected with old friends, including Matthew Rudy, and he fell into heavy substance abuse. He started drinking heavily, often drinking more than 30 beers in a single day.[2] He started

---

[2] While the number of alcoholic beverages may seem impossible to consume to some, counsel has spoken with multiple family members close to Tony in that time period who recall him consuming an entire "30 pack" of beers in a single day.

using cocaine for the first time, using it daily 2014- 2019.  He overused pain medication that had been prescribed to address his head injuries, including Percocet and Vicodin.

Tony's substance abuse was spiraling out of control.  In July of 2014 he was arrested for a Class E Felony DWI when he was found parked on the side of the road driving a U Haul truck.  Several more alcohol-related brushes with the law followed.

### e.  The Downward Spiral

Tony's alcohol and cocaine abuse were out of control.  His marriage was falling apart.  He reunited with his boyhood big brother figure, Matt Rudy, who introduced him to a large-scale Jamestown drug dealer.  Taking advantage of Tony's addiction and mental health issues, Rudy and the other drug dealer began supplying Tony with cocaine in exchange for muscle; that is, at times, Tony was employed by the drug dealer to fight or intimidate people who owed drug debts.   Tony is deeply remorseful for these actions.  With the benefit of mental clarity and hindsight, he knows they were wrong.  If he had been thinking clearly, he would never have engaged in that conduct, and he would never have allowed himself to be taken advantage to feed his addiction.

### III.    The Offense

In the Spring of 2014 Tony Neubauer was heavily addicted to cocaine and alcohol.  He was not receiving any medical care for his PTSD or for the trauma

associated with his repeated head injuries.  He was becoming estranged from his wife and kids.  Every day, he was hearing voices and experiencing combat flashbacks.

Worse, as set forth above, Tony's cocaine addiction was being supported by individuals who were taking advantage of him.  Seeing an easy mark, local drug dealers were supplying Tony with cocaine free of charge in exchange for work as their muscle. It is noteworthy that, although he used cocaine "all day, every day" in this period of time, he never had to pay for it; it was always supplied to him for free by the people who were taking advantage of him.

Against that backdrop, Tony engaged in the instant offense.  To be clear, as is set forth in the Plea Agreement in this case, Tony Neubauer aided and abetted the kidnapping of J.A. on May 27 and May 28, 2014.   In this regard, just as he did at the time of the PSR interview, Tony admits and acknowledges that the factual basis in the plea agreement is accurate.[3]

## IV.    Tony's Condition Gets Worse

In the years that followed J.A.'s disappearance, Tony's addiction and mental health issues became worse.  They effectively ended his marriage when he and his wife separated (although he remained married to his wife Erica until recently).  Those issues

---

[3] Together with counsel, Tony has prepared a statement reflecting his acceptance of responsibility which is attached to this memorandum.

led to several brushes with local law enforcement which are documented in the PSR, all of which are drinking/drug related.   Tony did not receive any treatment for PTSD or for his head injuries.  He received minimal treatment for his addiction issues, with little benefit.

Tony's ongoing mental health decline was captured, in part, in a 2016 interaction with Jamestown police.  In the Summer of 2016, in the throes of active addiction and experiencing clear hallucinations, Tony believed he was being followed by a group of masked men who were trying to kill him.  Tony led his family, friends and police on a chase on foot through the city, screaming at his family to stay away from him so that they too would not be killed by the hallucinated masked assassins.  His mother, who saw him at that time, recalls Tony screaming about the voices in his head.  After a lengthy chase, Tony was apprehended by law enforcement and taken to Jones Memorial Health Center, where he remained in-patient for a little over two weeks for mental health treatment.  Incredibly, upon discharge from Jones Hill, Tony did not receive much guidance in the way of follow-up care or treatment.  When interviewed, Tony acknowledges he did not seek treatment, as he continued to believe that the hallucinations he saw were real men trying to kill him.  Counsel notes that, in interviews with Tony's family members, no one insisted that Tony seek follow up mental health treatment or care.

Tony's struggles with addiction were captured again the following year.  In May of 2017, FBI agents visited Tony at his home in an effort to speak with him about J.A.'s disappearance.  The agents witnessed the severe addiction Tony was experiencing.  He looked ill, had lesions all over his face and skin, was gaunt looking, and was actively using cocaine in front of the federal agents, snorting lines of cocaine during the interview.  Concerned for the dire state Tony was in, FBI agents asked Tony if he wanted help; Tony indicated he wanted to get help for his substance abuse.  FBI Agents arranged for Tony to be admitted to in-patient substance abuse treatment at the VA Hospital in Bath, New York.  Tony remained in the program for 75 days until its completion.

Tony did not remain sober, unfortunately.  Shortly after discharge from the VA, he returned to using alcohol and cocaine.  His wife left him for good.  He never received mental health treatment.  He never received counseling for PTSD.  He never received any other or further substance abuse treatment.  His personal decline continued.

### V.    Tony is Shot and Paralyzed

On November 20, 2019 Tony Neubauer was drinking at a local Jamestown bar. When leaving the bathroom of the bar, he was shot two times in the abdomen.  One bullet entered the right mid-abdomen, traversing a lumbar vertebrae and spinal canal.

Another bullet entered the left mid-abdomen and kidney.  Tony lost a significant amount of blood.  There was no clear motive for the shooting.

Tony was transported to a trauma hospital at the University of Pittsburgh Medical Center.  He underwent several surgeries, including an exploratory laparotomy with right bowel resection, a right hemicolectomy, and the repair of duodenal enterotomy.

Tony nearly died.  The shooting left him paralyzed from the waist down, with significant restrictions regarding his ability to use the bathroom, bathe and travel.  The shooting remains unsolved.  The paralysis and other effects Tony experienced are likely to be permanent.

### f.  Life After the Shooting

Tony became even more deeply depressed after the shooting.  An active young man, he knew the use of his body would be compromised forever.   For a time he continued to drink and use drugs.  With time that changed, however.  In the years before his arrest, Tony had connected with Veterans' groups that were interested in target shooting.  He used those groups to try to build meaningful and supportive relationships.  He also learned how to play wheelchair football, joining the local Buffalo Bills affiliate team, playing in a league against other teams.

More importantly, Tony had reconnected with his children, and he was making an effort at co-parenting with his ex-wife. Despite his physical and mental limitations, Tony Neubauer was doing what he could to make the most of life.

Tony Neubauer was arrested in this case in March 2023. He has been in federal custody since that time.

## VI.    Analysis of the Sentencing Factors

As the Court knows, 18 U.S.C. 3553(a) requires a district court to impose a sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Gall v. United States*, 552 U.S. 38, 48-50 (2007). "The sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, explaining any variance from the former with reference to the latter." *Nelson*, 555 U.S. at 351.

When determining a sentence in light of these goals, as relevant here, the key factors a court must consider are: (1) the nature and circumstances of the offense, (2) the offender's history and characteristics, (3) the sentencing range established in the

Guidelines, and (4) the need to avoid unwarranted sentence disparities among similarly situated defendants.  *See* 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

The Court's discretion to give such weight to these factors as it deems just is broad, and it may consider any fact that it deems relevant to sentencing.  *See, e.g.,United States v. Greene,* 249 F.Supp 2d 262 (S.D.N.Y. 2003) (defendant who had pled guilty to tax charges and faced incarceration in accord the Federal Sentencing Guidelines was sentenced to three years of probation because of his civic and public service, the health needs of his family, and the nature of the charges.); *United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (affirming downward variance based on judge's own "sense of what is fair and just" and defendant's "education, emotional condition, favorable employment record, family support, and good record on state probation"); *United States v. Ortiz*, 213 F. App'x 312, 317 (5th Cir. 2007) (holding that the district court properly considered, among other factors, defendant's lack of criminal history, family responsibilities with aging parents and children in his care, services in the armed forces and his stable work history); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

A review of the purposes set forth in Section 3553(a) reveals Tony is worthy of leniency.  In light of the goals of "just punishment," deterrence, protection of the public

and rehabilitation (§ 3553(a)(2)(A)-D)), the defense submits the facts of this case support a sentence of 120 months.

### a. Just Punishment

The defense does not contest that Tony engaged in wrongdoing.  The defense also does not contest the need for Tony to be punished.  J.A.'s life was cut short in part due to Tony's actions.   This is a serious crime.  The people responsible must experience serious consequences. That seriousness is reflected, in part, in the agreed guideline range of 120-240 months of incarceration in the Plea Agreement.

Beyond the facts of the crime, however, it is also clear Tony's mental health issues and addiction played a large part in the conduct.  While Tony bears some responsibility for failing to seek and obtain counseling and for his substance abuse, it is also uncontested that Tony was not thinking clearly at the time of the offense and was influenced by others who were taking advantage of him.  Under significant mental turmoil and struggling with addiction, Tony's actions do not evidence a purely criminal mind;  they evidence a mind that was severely impaired.

### b. Deterrence

The Guidelines require district courts to consider the need for their sentences to afford adequate deterrence to criminal conduct. 18 U.S.C.S. § 3553(a)(2)(B). This requirement in turn requires courts to factor in the need for a sentence to provide

adequate general deterrent value. The § 3553(a) factors expressly provide for consideration of general deterrence. General deterrence, defined as a goal of criminal law generally, or of a specific conviction and sentence, to discourage people from committing crimes, is about preventing criminal behavior by the population at large and, therefore, incorporates some consideration of persons beyond the defendant. *United States v. Davis*, 82 F.4th 190, 193 (2d Cir. 2023).

The defense concedes it is important that crimes like this do not occur in our society.  The defense does not ask the Court to condone or accept Tony's misconduct.  However, the defense also submits that the facts and circumstances of this case are unique and specific to Tony and his highly unusual history and characteristics.  That is also reflected in the 11(c)(1)(C) nature of the Plea Agreement and the unique factual basis contained therein. There is nothing common about the circumstances of this case, and that should therefore counsel the Court to discount the factor of potential deterrence in considering a fair sentence.

### c. Protection of the Public

As the Court knows, at the time of the offense Tony Neubauer was a 230 lb former Marine, former Army Ranger, who was struggling with mental health and addiction.   He was well-versed in martial arts and had demonstrated history of aggression.  Because of the 2019 shooting and the paralysis resulting therefrom, Tony

Neubauer is no longer capable of fighting; with the increased clarity that has come with sobriety and incarceration, he no longer exhibits the tendencies that led him to engage in the misconduct at issue.   He intends to follow through with substance abuse and mental health treatment for the remainder of his life.

Stated more plainly, the offense occurred over ten years ago when Tony Neubauer was a different person.  The person the Court will sentence in this case is physically, mentally and emotionally different, and there is little reason to believe he will re-offend or pose any danger to the public in the future.

### d.  Rehabilitation

In the defense's view, the keys to Tony's rehabilitation are access to mental health treatment and drug rehabilitation.  Consistent with that view, we respectfully request that the Court make a recommendation for drug rehabilitation while Tony is incarcerated as a result of this sentence.

That said, without question, Tony will have more access to better, more personally tailored treatment out of custody.   Tony is committed to doing what he can to heal himself – whether it is through the Bureau of Prisons or Probation.

### VII.    Specific Sentencing Issues

Consistent with the relevant case law, there are specific factors unique to Tony that the defense believes should further counsel the Court to the 120-month sentence.

### a. Military Service

"Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006). Courts have varied downward where the defendant's past behavior demonstrates public service. *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir 2005); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005).

Consistent with that well-established variance, the Court should take account of Tony's extraordinary military service at the time of sentencing. In all, Tony was deployed six times. He spent eight years active duty in the United States military, and he was permanently disabled as a result of his service to this country. He fought in the most dangerous battles our nation has waged in recent memory. In the most plain and stark way, he risked his life to protect our freedom. He gave up his health and well-being for this nation. Tony's military service should be a factor the Court takes account of in imposing a 120-month sentence.

### b. The Effects of Imprisonment on Tony's Health

A court may vary or depart downward based on the medical needs of a defendant. U.S.S.G. 5H1.4 ("An extraordinary physical impairment may be a reason to

depart downward; e.g. in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment; *United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (affirming probation for possessing fifteen images of child pornography, despite guideline range of twenty seven to thirty three months, in light of first time offender's need to continue medical treatment with psychologist); *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008) ("The Guidelines and our decisions…allow variances on the basis of poor health.").

By all measures Tony Neubauer is in poor health. Of course, he continues to struggle with his mental health and addiction.  More seriously, however, his paralysis makes imprisonment far more challenging and punitive for Tony Neubauer than for a healthy individual.  Tony cannot walk on his own, and it is likely he will never walk on his own; he has a colostomy bag and catheter, and he will never be able to use the bathroom like a normal, healthy individual; he suffers from sores, skin issues and persistent urinary tract infections because of his inability to move and the presence of his catheter; his TBI leaves him with significant memory impairment and slurred speech; with respect to medication, he depends on gabapentin for nerve pain; oxycodone for nerve pain; Eliquis to prevent blood clots; Remrom to sleep, and Zoloft to battle his near crippling depression.

Finally, counsel notes that Tony has not received physical therapy at any time he has been incarcerated.  Before going into custody, Tony regularly engaged in physical

therapy in the hopes he would walk again.  Now over two years removed from that

therapy, Tony feels his ability to walk has diminished, and he concedes it is unlikely he

will ever walk again.

### c.  Vulnerability in Prison

Courts may consider a defendant's vulnerability to victimization or abuse in

prison when determining a just sentence.  U.S.S.G. 5H1.4 ("Physical condition or

appearance, including physique, may be relevant in determining whether a departure is

warranted, if the condition or appearance, individually or in combination with other

offender characteristics, is present to an unusual degree and distinguishes the case from

the typical cases covered by the guidelines."); *Koon v. United States*, 518 U.S. 81 (1996)

(holding that it is not abuse of discretion to grant a downward departure to police

officers convicted of civil rights violations due to their vulnerability in prison); *United*

*States v. Gonzalez*, 945 F.2d 525 (2d Cir. 1991) (affirming a departure for defendant who

had "feminine cast to his face" and "softness of features" that would make him prey to

prisoners).

Tony's wheelchair bound status makes him vulnerable within the prison

population.  His status as ex-military makes him a target of inmates who do not respect

the government or authority and who are aware that, because he is retired military, he

likely has access to monetary resources that most inmates do not.  His TBI and the after

effects make it difficult for him to appropriately process information and to communicate with other prisoners.  On two occasions while Tony was incarcerated at Northeast Ohio Correction Center undersigned was alerted to other inmates extorting Tony by threatening violence of other retaliation.  Because he is limited in his ability to defend himself, Tony Neubauer is uniquely vulnerable within prison.  The Court should take that into account in fashioning an appropriate sentence.

   d. **Struggles with Mental Health**

   The Guidelines allow a downward departure if: "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the crime." U.S.S.G. 5K2.13.  Diminished capacity also is relevant under 3553(a). *United States v. Gerguson*, 942 F.Supp.2d 1186, 1194 (M.D.Ala. 2013)(varying downward to a sentence of probation where defendant suffered from schizoaffective disorder, PTSD, and neurocognitive limitations); *United States v. Pallowck*, 364 F. Supp.2d 923 (E.D. Wis. 2005) (imposing sentence of forty-six months where defendant was convicted of six armed bank robberies because of defendant's major depressive disorder and anxiety disorder played a major role in his conduct).

There is no question that Tony Neubauer's struggles with mental health and his diminished capacity played a significant role in this offense. Consistent with the Guidelines and the case law, that should also counsel the Court toward leniency.

## VIII.   Conclusion

At a time of addiction and poor mental health, Tony Neubauer broke the law. He acknowledges that his poor judgment aided and abetted the kidnapping of J.A., and he acknowledges that he committed a serious crime. He welcomes the consequences that will be imposed by this Court so that he can atone for his wrongs and bring closure to J.A.'s family. As he stands before the Court for sentencing, Tony Neubauer has emerged from the fog of addiction and mental health crisis and wants to do what he can to make things right.

But there is much more to Tony Neubauer. A difficult upbringing, exemplary and extraordinary military service, struggles with mental health and addiction contributed to the offense. The defense believes Tony Neubauer is a good person who made poor decisions. His unique mental, emotional and physical circumstances make him worthy of leniency.

In light of the foregoing, the defense respectfully requests a sentence of 120 months of incarceration in this case.

DATED:      September 12, 2025

                                         _s/ Eric Soehnlein_
                                        Eric M. Soehnlein, Esq.
                                        2100 Main Place Tower
                                        350 Main Street
                                        Buffalo, NY 14202
                                        716-771-9092