IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────────────

UNITED STATES OF AMERICA,

            v.                             23-CR-36-W

ANTHONY NEUBAUER,

               Defendant.

───────────────────────────────────────

## GOVERNMENT'S POST-SENTENCING HEARING MEMORANDUM OF LAW

**THE UNITED STATES OF AMERICA**, through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, Michael J. Adler, Assistant United States Attorney, of counsel, hereby files its Post-Sentencing Hearing Memorandum of Law.   This memorandum addresses the testimony of two witnesses at the sentencing hearing held on November 19, 2025, as transcribed at Doc. 142 (hereinafter, "Transcript").

## I.      PROCEDURAL BACKGROUND

On September 9, 2024, the defendant, pursuant to a written plea agreement, waived indictment and pled guilty to a one-count Superseding Information which charged a violation of Title 18, United States Code, Sections 1201(a)(1) and 2 (aiding and abetting kidnapping). As part of his guilty plea, the defendant admitted that on May 27, 2014, the defendant and Matthew Rudy kidnapped Joseph Anthony by tricking Mr. Anthony into traveling to Pennsylvania by an offer of cocaine.   Doc. 109 at 3.   The defendant further admitted that Mr. Anthony was shot in the head and killed in Pennsylvania, in a manner constituted first degree murder.   Id.

The PSR was issued on May 5, 2025 (doc. 116) and revised on September 24, 2025. Doc. 129.   The PSR detailed facts from witness testimony including admissions that the defendant had made about the kidnapping and murder of Joseph Anthony.   See, e.g., doc. 129 at ¶ 20.   The defendant filed objections to the Presentence Investigation Report ("PSR"). Doc. 133.   The government responded to those objections.   Docs. 132 (redacted) and 134. Much of the government's response cited Grand Jury testimony of witnesses who directly contradicted claims the defendant had made in his objections. One of the three main arguments the government asserted in its filing was that "the defendant's own admissions to other witnesses that he had shot and killed J.A. were, in fact, credible in light of the other evidence." Doc. 132 at 2.

On October 1, 2025, the parties appeared for sentencing.   At the appearance, the defendant challenged the credibility and reliability of the Grand Jury testimony cited by the government.   As a result, the Court suggested an evidentiary hearing to explore the statements made by the defendant to government witnesses.   On November 19, 2025, the government called to testify two of those witnesses to whom the defendant had made significant statements: 1) the defendant's former girlfriend, Phoenix Kirsch; and 2) the defendant's longtime family friend and former roommate, Robert Kinne.

## II.     LEGAL FRAMEWORK

Lengthy sentencing hearings should seldom be necessary.   U.S. Sentencing Guidelines Manual § 6A1.3(a) cmt.   Disputes over factual information can be resolved in a number of different ways.   "It might consist of opposing affidavits, letters or other writings, argument and comment directed to the court, cross-examination of witnesses, or a full-blown evidentiary

hearing." United States v. Prescott, 920 F.2d 139, 143 (2d Cir. 1990). Whether through the submission of briefs or the presentation of evidence at an evidentiary hearing, the types of evidence that may be received are far broader than what would otherwise be admissible at a trial. Indeed, as the Second Circuit held in United States v. Reese, "a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal." United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994).

The Sentencing Guidelines also state that "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S. Sentencing Guidelines Manual § 6A1.3(a) (2024); see also Fed. R. Evid. 1101(d)(3) (Rules of Evidence inapplicable at sentencing); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). As then Circuit Judge Sotomayor wrote in United States v. Martinez, 413 F.3d 239 (2d Cir. 2005), even the Confrontation Clause does not apply at sentencing: "Both the Supreme Court and this Court . . . have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings." Martinez, 413 F.3d at 242. Hearsay evidence, or testimony, must still adhere to the due process requirement of having "some minimal indicia of reliability." United States v. Martinez, 413 F.3d 239, 244 (2d Cir. 2005); United States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007) ("[f]actual matters considered as a basis for sentence must have some minimal indicium of reliability beyond mere

allegation."); U.S. Sentencing Guidelines Manual § 6A1.3(a) (2024) ("sufficient indicia of reliability.").

In determining the credibility of a witness at a sentencing hearing, the Court is given substantial deference.   United States v. Norman, 776 F.3d 67, 78 (2d Cir. 2015) ("[T]he judge who presided over . . . an evidentiary sentencing hearing is in the best position to assess the credibility of the witnesses, and her decisions as to what testimony to credit are entitled to substantial deference.").   In addition, a sentencing court is "entitled to credit some parts and to disbelieve other parts" of a witness's testimony.   Id. at 78.

## III.   ARGUMENT

### A.   Phoenix Kirsch Is Credible

Phoenix Kirsch testified that the defendant told her that he had murdered Joseph Anthony. Transcript at 13.   With significant details, she described how the defendant told her 1) the motive for the murder; 2) the way in which he manipulated (or tricked) Joseph Anthony to go to Pennsylvania, 3) the specific car they drove to get there, 4) the detail that the defendant held a gun to the back of Joseph Anthony's seat during the drive to Pennsylvania; 5) the location of the murder on a hill on Matthew Rudy's property in Sugar Grove, Pennsylvania, 6) the fact that the defendant pretended to fall down the hill prior to Joseph Anthony going to help him, and 7) how the defendant recalled shooting Joseph Anthony in the head and torso. Id. at 13-14.   She even described the defendant's declaration to her that the FBI had "walked right over the body" during their search of Rudy's property.   Id. at 16.   Her testimony alone is sufficient for the Court to find by a preponderance of the evidence that the defendant murdered Joseph Anthony when fashioning an appropriate sentence.   Given that she did not

even know the defendant at the time the murder was committed in May 2014, her familiarity with these uniquely specific facts can only be explained if the defendant actually told her. Her testimony is also sufficient to provide the "minimal indicia of reliability" for the Grand Jury testimony detailed by the government in its prior response to the defendant's objections. Doc. 134. After hearing Ms. Kirsch's testimony at the hearing, it is clear her testimony was both credible and reliable.

Ms. Kirsch is not the same woman today that she was when she was in a romantic relationship with the defendant. She described her struggles with drug addiction during her testimony. Transcript at 7. She was funding her drug purchases by working as an exotic dancer. Id. at 6. At the hearing, Ms. Kirsch described her current job in a laborer's union. Prior to that, she was a server and manager at a family-owned restaurant. Id. at 3-4. She was open and honest about her struggles with addiction and admitted to having relapsed in both July and September 2025. But she also described how she had managed to stay clean for the three years prior. Id. at 7-8. As Ms. Kirsch testified at the hearing, she has no pending charges, nor need for any sort of benefit from the government. Simply put, Ms. Kirsch had no reason to lie.

Ms. Kirsch was also clear that she had no bias in favor of the victim, Joseph Anthony, or the defendant's co-conspirator, Matthew Rudy. Ms. Kirsch testified about her dislike of Matthew Rudy. Id. at 11 ("and the feeling was mutual."). She was adamant that Rudy was equally culpable to the defendant. Id. at 25. And she had never personally met the victim, Joseph Anthony, at all. Id. at 13. If anything, Ms. Kirsch was biased in favor of the defendant: someone she still felt love towards. She was visibly emotional at multiple points

during her testimony.    She testified she still cared for Tony as she sat there during her testimony.    Id. at 32.    Even back when Ms. Kirsch testified in the Grand Jury, she acknowledged that she called the defendant after her testimony to tell him.    Id. at 12. Nonetheless, she has been consistent throughout the years that the defendant confessed to her that he shot and killed Joseph Anthony.

Ms. Kirsch's demeanor during her testimony supports the conclusion that her testimony was credible.    Ms. Kirsch did not hide from areas of her memory that were foggy.    She testified as to what she remembered and was clear about which facts she was uncertain of.    For example, when asked about where she and the defendant were when he confessed the murder of Joseph Anthony to her, she was clear it was a "vulnerable moment" but could not definitively remember where the conversation had happened.    Id. at 15. When pressed by defense counsel, she did not hesitate to acknowledge that drugs had fogged her memory.    Id. at 23-24.    But she also testified that the defendant's murder confession itself was clear.    Id. at 31.

Ms. Kirsch never sought details about the murder from the defendant.    She was shook by the fact that he had openly volunteered it.    Id. at 15, 34.    Although defense counsel asked Ms. Kirsch about the defendant's tendency to brag, which she acknowledged, she further testified that this murder confession was not a bragging moment.    She stated that she "felt like he didn't want to carry it anymore." Id. at 31.    When the Court inquired as to how Ms. Kirsch felt at that moment, she thoughtfully responded: "I try to only see the good in people, to a fault, where I will willingly look past somebody's evil to specifically see the good.    So inside, I was like, wow.    Like, that's insane.    But I guess I didn't really care; not that that happened

because, obviously, I cared somebody lost their life, but I only wanted to see the good." Id. at 34.

**B.    Robert Kinne Was Biased in Favor of the Defendant and Still Testified to the Defendant's Knowledge of Where Joseph Anthony Was Buried**

Robert Kinne admitted to being biased in favor of the defendant.    He testified how he had been friends with the defendant's mother for years and had known the defendant since he was 18 months old.  Id. at 38-39.    He testified he was close with the defendant, id. at 43, did not want to say anything harmful about the defendant, id., and did not want to testify at all. Id. at 45.

On multiple occasions during his testimony, Kinne made statements that minimized even minor character flaws of the defendant.    For example, Kinne claimed during the hearing that the defendant did the "best he could" with physical therapists.    Id. at 41-42. Kinne eventually admitted that he had, in fact, previously told the government that the defendant had said "F that" about his physical therapy.    Id. at 43.    Kinne also volunteered that he had no memory issues.    Id. at 36.    Eventually, he acknowledged that he had forgotten Special Agent Chad Artrip when he served Kinne his hearing subpoena.    These statements should be weighed by the court for what they are: indicators that the witness really did not want to testify against his friend.

Despite this reluctance, Kinne still reiterated that the defendant had told him after the FBI departed their shared residence that "he isn't buried in Kennedy.    He is buried in

Pennsylvania." <u>Id.</u> at 48.   Moreover, Kinne acknowledged that anything he said in the Grand Jury was closer in time to the FBI interview and would have been true.   <u>Id.</u>

**C.     The Testimony is Corroborated**

Even though the Court can find that the defendant admitted to the murder of Joseph Anthony and knew where his body was buried based on the above testimony alone, these findings are further corroborated by the Grand Jury testimony detailed by the government in its response to the defendant's objections to the PSR.   Doc. 134.   As the government previously stated therein, when taken in its totality, and when considering the fact that the various witnesses did not, or barely, knew each other, their statements paint a picture that far exceeds the "minimal indicia of reliability" required for their inclusion in the PSR.   <u>See</u> <u>United States v. Martinez</u>, 413 F.3d 239, 244 (2d Cir. 2005).

Every witness testified about the defendant's physical capabilities in May 2014. Phoenix Kirsch and Robert Kinne both described the defendant's massive physical stature during the hearing.   Ms. Kirsch testified that the defendant "used steroids," Transcript at 9-10, and was "pretty muscular, pretty fit, stocky." <u>Id.</u> at 10.   Mr. Kinne also described the defendant as "a big boy" and "very muscular." <u>Id.</u> at 40-41. As detailed in the government's prior submission, Grand Jury testimony from other witnesses made clear that Matthew Rudy could not have buried Joseph Anthony without the defendant.   Multiple witnesses, including Phoenix Kirsch at the hearing, testified about Rudy's physical limitations.   Ms. Kirsch testified that "his arm didn't work," <u>id.</u> at 10 and that he "could not dig a hole." <u>Id.</u> at 30. <u>See also</u> Gov't Ex. 3504K at 27; Gov't Ex. 3537A at 6-7.

Ms. Kirsch testified about the motive the defendant explained to her for having killed Joseph Anthony.  Specifically, she testified that the defendant told her that Joe had raped Rudy's girlfriend.  Transcript at 13.  Although there were two motives the government would have explored at trial (including orders from the defendant's admitted superior in the narcotics trade), the significance of this testimony is not the motive itself.  Rather, it is the fact that the only way Ms. Kirsch could have known this motive was if the defendant had told her himself.  As detailed in the previously provided Grand Jury testimony, Joseph Anthony had, in fact, kissed Rudy's girlfriend on the neck in an unwanted touching.  Gov't. Ex. 3537A at 15-16.

Ms. Kirsch testified to the specific vehicle that the defendant and Rudy operated to take Joseph Anthony to Pennsylvania.  Transcript at 13.  She described how the defendant told her where he was sitting.  And she described the topography of the hill on which the defendant admitted he shot Joseph Anthony.  All of these facts she could only have known if the defendant had told her himself.  And all of them were corroborated by the testimony of other witnesses, including Special Agent Chad Artrip who was present when Joseph Anthony's body was found buried on a hill.  The government also provided the topographical map that showed the terrain where Joseph Anthony's remains were, in fact, found.  Gov't Exs. 111 and 112. Ms. Kirsch testified how the defendant told her that he had shot Joseph Anthony multiple times, a fact also corroborated by the evidence from the forensic anthropology team showing multiple gunshot wounds.  See Gov't. Ex. 3504Ak at 35-36.[1]  Ms. Kirsch even testified to the defendant's statement that the FBI had "walked right over the body" during their search of

---

[1]  The government's evidence would have been multiple shots to the head as evidenced by skull fractures.  The government cannot corroborate the shots to the torso based on the forensic evidence.

9

Rudy's property.   As addressed above, Mr. Kinne's testimony that the defendant had stated "he is buried in Pennsylvania" corroborates the defendant's knowledge as to where Joseph Anthony was buried.   Notably, Ms. Kirsch first reported to the FBI the general location of Joseph Anthony's body years before the FBI actually located his remains.   Gov't. Ex. 3502D (marked for sentencing hearing).


As the government pointed out in its response to the defendant's sentencing memorandum, doc. 128, the defendant had interviewed with the FBI on multiple occasions. In each of these interviews the defendant denied knowing anything about where Joseph Anthony was buried.   Despite overwhelming evidence that the defendant was present for the murder of Joseph Anthony, the defendant repeatedly denied he was even there.   In 2015, the defendant told the FBI he was at his mother's residence on the evening of Joseph Anthony's disappearance and never left.   See doc. 116 at 5.   In 2017, the defendant admitted he was with Matthew Rudy and that he had been asked to dig a hole, but again declined having been with Joseph Anthony and denied being involved in Joseph Anthony's disappearance.   Id. at 6.   In 2021, the defendant admitted he had traveled to Pennsylvania with Rudy and Joseph Anthony but claimed Rudy and Joseph Anthony. had walked into the woods and that Rudy returned alone.   Notably, the defendant's historical-cell site was inconsistent with all of these versions, as the defendant was clearly at Rudy's Pennsylvania property for hours on the evening of Joseph Anthony's disappearance.   His evolving statements are in contrast with the credible and reliable testimony at the sentencing hearing.

## IV.    <u>CONCLUSION</u>

The testimony at the sentencing hearing supported the government's request for a sentence consistent with the sentencing guidelines of 240 months.    The testimony about the defendant's role in the murder of Joseph Anthony was consistent with the arguments previously offered by the government.    The government respectfully requests that the Court deny the defendant's request for a below-guidelines sentence.

DATED:        Buffalo, New York, January 16, 2026.


MICHAEL DIGIACOMO
United States Attorney


BY:        <u>s/MICHAEL J. ADLER</u>
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5857
Michael.Adler@usdoj.gov